Good morning, Your Honor. Philip Leggenbaum on behalf of Mr. DeSyllas. May it please the Court. We're asking you today to determine whether the encounter between Mr. DeSyllas and the official of Portland State University was, number one, a consensual encounter or an involuntary detention. And if it's an involuntary detention, was there reasonable suspicion or other state interests which would allow such detention in this case? The interesting twist in this case is that the person detained, that we allegedly detained, was the editor of the student newspaper, and the object of the coercion and search and detention was his investigative files for an article he was about to write. It may have begun as a consensual encounter with the state officials attempting to obtain the box of confidentiality. Before you proceed further, I want you to help me out on the facts. I'm a little puzzled. If I recall the briefing, these records were originally found on November 10th near a certain kitchen. Some students found them. The next we know they are outside the office of this student newspaper. What does the record show as to the location and disposition of the records in that one-month period? The records do not reflect, at least as of the time the Portland state officials got involved, when the box was found. They had a note from the editor saying this box was placed outside the newsroom door, with a note saying it had been found in the cafeteria area of the student union. There was no time frame. No, no, excuse me. Where did I get the November 10th time frame? That was deduced in deposition of my client, where he said, yes, indeed, I've had this box since November. But that's not within the knowledge of the state actors when they give the contact. All right. Thank you. You're welcome. So your client had them from the from November 10th, not from December. I can't be clear on that. He clearly had them for months prior to. But I don't think that's relevant to this analysis because. Well, I'm just looking at the fact that it may be relevant, sir, as to the length of time he had possession of them and the time he wrote the letter to the to the to the president. Sir. Mr. Lieberman, with some point during your argument, I would appreciate it if you could express your client's views on the key facts or whatever are the strongest facts that you would urge indicate that he felt he wasn't free to leave, that he was really in custody or constrained. I have them listed. One of the facts was the sergeant. So was brought upon, brought along for, quote, uniform presence. Chief Fowler insisted to Mr. D'Souza that he would stay with him all night long. If need be. Chief Fowler said he would obtain a search warrant, which in these circumstances is false, because 42 U.S.C. section 2000 doesn't allow a search warrant in his room. Except under certain circumstances. He told one of the witnesses here that he could. What are the circumstances and why don't why don't they fit? You have to obtain it. You have to. Under 2000 AA, a party warning newsroom material must subpoena it to a court. And there's a. It's my understanding there's a procedure by which the court can either quash or allow. Does that include items that conceivably belong to someone else and have been retained without the consent of the owner? If the statute reads, it talks about investigative materials of newsrooms. So investigative materials that are either stolen or kept clearly without the consent of the owner, you can't get a warrant to get those without going through those procedures, in your view. I think that's correct. I think the statute is very clear on that. These are investigative materials of a newsroom. And the statute was enacted after the Stanford Daily case. I'm assuming in response to the Stanford Daily case, where the warrant was found to be valid against a newsroom. The Congress passed 2000 AA. Did that involve stolen materials? I believe it did. But again, these, I wouldn't assume, I wouldn't concede that these were stolen materials. These were abandoned. They were found in the Smith Lounge. They were lost by the state. And my client certainly had no, I don't think there was any suspicion that he stole them. I don't think. I'm sorry. Go ahead and finish your point. I don't think there was any suspicion that he stole them. The best that they could come up with was he was keeping abandoned property. But that doesn't meet the theft I received. He has to have an intent to deprive the true owner of them. And that wasn't shown. I'm still hung up on the uniform presence there. But but you haven't indicated anyone said to him, you're not free to leave. And or in words, words or substance, if that was indicated. And why does someone saying we can get a search warrant if we need to? Why does that leave or lead a reasonable person to feel they're not free to go? It's just one more piece of the course of the atmosphere that was there that included the one uniformed officer. There were also two other uniformed officers on bicycles outside. It seems it seems to indicate to me that there's a manifested intention to get their hands on these documents. But I don't see how that necessarily means that it's a manifested intention to corral the appellant. Well, I think it was by the threat to say a line with him to get a search warrant. The threat to his co-workers are his co-students that they were going to arrest him. Certainly, this atmosphere was coercive. He felt not compelled to leave. The other witnesses said it was tense. It was hostile. It was stressful levels. Nobody in the room thought he was free to leave due to all these uniformed presence, the threats of the chief of police. And not only that, when he went to his newsroom, he was coming to his newsroom. They had a clamshell lock on the outside of the newsroom that had to be unlocked for him to get in. And after he left, they locked it up again. Clearly, his motions in and out of the newsroom. Well, certainly, your client knew that these were confidential materials. Did he not? He did, and he expressed his concern, yes. And he knew that they were probably taken from some secure place. I believe he thought they were lost. Lost. Lost. But there was also a possibility that he had knowledge that they were stolen. And would that not at least be a reasonable suspicion that he was guilty of the crime of, well, the old common law, receiving stolen goods or whatever it is described in the Oregon statute? No. Not burglary, not theft, but actually receiving materials that were stolen or the subject of theft. Well, the Oregon statute is theft by receiving. Yes. But I think you have to show that he thought or knew they were stolen, and he did not. They were abandoned, in his opinion. That was the whole story, Your Honor. Excuse me. When you say they were abandoned, aren't you putting the bunny in the hat? Aren't you assuming that because I don't think the record shows how they moved from a secure location to first the position outside the kitchen and then outside the newspaper editor's office. I think that was the gist of the entire story he was going to write. How could these confidential documents come into the public arena? That was the point of the story he was investigating. So I agree with you, but I don't think there's any evidence that he knew or intended to deprive anybody of these documents. What is the justification, though, for keeping the documents, even in view of his desire to write the story? Because once having determined the identity of what he had, the story was completed without the additional opportunity to go through what he knew to be confidential documents. So what possible justification would there be for retaining them? Well, he told us in deposition and in the excerpts of records that there were some that were set to be destroyed, and he hadn't had time to compare those that had been destroyed with those that hadn't been set to be destroyed, so he needed those documents at that time. I have 30 seconds left. I don't want to walk away from anything important, but I do want to save some time for rebuttal. Thank you. Thank you, Matt. Thank you. Mr. Casey? May it please the Court, Counsel, and Casey for defendants, for honors. I would first like to start with apologizing for misciting Doe versus Gonzaga. That is not an interpreted opinion. It is, as the plaintiff points out, a decision of the Washington State Supreme Court, and I miscited it, and that was incorrect. And also that decision by the Washington Supreme Court was reversed by the U.S. Supreme Court in Gonzaga versus Doe. Nonetheless, Gonzaga versus Doe was not decided until June of 2002, which is 16 months after the events underlying this claim. It was in February of 2001. At the pertinent time, it was still an open question whether the university faced private Section 1983 liability for the disclosure of those records. But alternatively, your honors, even if the university did not face such liability, the plaintiff does not dispute. He actually admits he didn't own the documents.  He does not dispute that under the federal act, the university had a duty to maintain confidentiality. And he also does not dispute that the university could have lost federal funding if it failed to do so. What difference does it make to the outcome if the documents, in fact, were abandoned, so that they, within the meaning of the doctrines that say that one has no further interest in abandoned property? Well, I first, if I could take a step back, the record doesn't support an inference, even when construed in the light most favorable to the plaintiff, that they were abandoned. Because what the plaintiff looked at, he saw these were confidential things. Mental health evaluations, police reports, investigations of plagiarism. Even he knew that they were not abandoned. He said in his letter to the administration that these were lost documents. Would you keep your voice up, please? Yes, I'm sorry, your honor. I'm sorry. What would have, what was done or said that would have led him to think that he wasn't free to leave? That he wasn't free to leave. Or what would your view be as to why what was done or said would not make him feel he was constrained? What we have on plaintiff's side is the statements of we can get a warrant, you can be arrested, I can stay here all night if we want to. Now, Mr. Fowler disputed saying we can stay here all night, but this is summary judgment, and we take that as true for purposes of this motion. But your honor, on the other side, we have plaintiff dictated the time and place of the meeting. He kept, and you're correct, I'm sorry, it was November 10th to approximately February 23rd. It was three and a half months he had these documents. So he had them for three and a half months. He decided when to tell the university, here they are. What difference does that make? Suppose he had told them the day that he got them, and the same statements had been made, and the same number of uniformed persons had been there. Why does that make any difference to his reasonable view of whether he was free to leave, the fact that it was February instead of November? Because, your honor, it's one factor going to show that he actually had more control of this situation than plaintiff would like to quote. Only its inception, but not its actual carrying out. Well, respectfully, your honor, he gave the notice, the letter to Bar Johnson, student body president. He sat there in her office and he waited. That would be reasonable to think that something's going to happen and they're going to come back. It was as if he was waiting there for them. When they came in and said, let's talk someplace more private, he said, no, I want to stay here. There's witnesses here. I want to stay here. And they said, fine. He was in control of that situation. Also, he left twice during the meeting. He went out, he said, I need to call my lawyer and I need to call my faculty advisor. They said, fine. Sergeant Soto went with him, but he went with him for the express purpose of taking the clamshell lock off the newsroom door. And when they went outside for a cigarette, the student body president came up to Plaintiff and talked to him, called him away, said, come over here, I want to talk to you. Sergeant Soto did not follow. Plaintiff went over with Bar Johnson and talked. And then it was after that conversation he decided, okay, I'll give up the documents. Those way on the side of saying this was not a seizure, he was not stopped, a reasonable person would have felt free to leave. But alternatively, Your Honors, even if he was stopped, there was adequate support under the Fourth Amendment in Terry. First, it doesn't need to be reasonable suspicion of criminal activity. It only needs to be reasonable balancing the government interest against the level of intrusion. Excuse me. While you're taking a breath there, how is the balancing that you've just described altered by the fact that there is heightened First Amendment protection in the context of a newsroom? Your Honor, the only – I'll address that two states. First, the Supreme Court has held clearly that if government action towards the press that constitutes a search or a seizure does not violate the Fourth Amendment, then it also does not violate the First Amendment. Now, as to the statute that plaintiff mentioned here this morning, that wasn't cited in the briefs. It wasn't cited in the materials. I don't know if that statute is applicable only to federal courts, it is a federal statute, or if it's applicable to all courts. And that may raise – I don't know if that raises an issue whether Congress has any business telling states how to interpret the Fourth Amendment. That's the response to that question. Now, if we needed reasonable suspicion of criminal activity, it's not just theft by receiving. The statute that was cited in the brief, that was cited by the magistrate, and that was argued by defendants below, Oregon Revised Statute 164065, is failure to return – excuse me – 164065, failure to return property that the person knows or has good reason to know to have been lost, mislaid, or delivered under a mistake as to the nature or amount of the property with the identity of the recipient if, with the intent to deprive the owner thereof, the person fails to take reasonable measures to return the property. And that's where the length of time comes in, in your view. Three and a half months. And that's what, in your view, gives reasonable suspicion. If he'd done it the day after, it would be pretty tough for you to argue that there was reasonable suspicion. Well, not necessarily, Your Honor, because – I'll stop right there. Yes, that's correct. Yes. So we have this, and any implication that Melinda Greer, the university's attorney, said, well, there wasn't any criminal investigation going on. John Fowler, the public safety chief, testified that there – I suspected a crime had been committed. I didn't necessarily know if this guy had committed a crime, but I thought the documents were stolen. And Ms. Greer also testified to that fact. And under the Fourth Amendment, the question is not what the individual officer subjectively believes. It's whether there was reasonable suspicion under objective circumstances to believe. And there was in this case. Your friend conceded that he knew that these records were confidential. Yes, Your Honor. What does the record show as to the time when he knew that, that he acquired that knowledge? I don't know specifically, Your Honor. What I could point the court to is he testified that he reviewed the documents before Christmas break, so sometime before November 10th and December 25th. If he reviewed the documents during that time – and this is tough, because I want to say on one point, it's a reasonable inference to draw, but it's a summary judgment, and we've got to draw reasonable inferences for the plaintiff – the length of time that he had it and that he reviewed it before Christmas break. That's all I'm going to say. At least we know from the concession that he knew that they were confidential at the time that people came to talk to him about it. Yes, Your Honor. He had written the memo by then, and clearly in that memo he stated that these were – if he didn't state these were confidential documents, the way he described them showed that he knew they were confidential documents. Could you explain to me the significance of the – I guess it's called the clamshell block? Yes, Your Honor. On that issue, the Supreme Court has held that police may secure a residence from the outside while awaiting a warrant without violating the reasonableness requirement of the Fourth Amendment, and no more than that was done in this case by Southerner. In other words, they go into the – is it before they go in they put the lock on or after they go in? It was sort of congruent. They went down. Nobody was at the newsroom. They went upstairs looking for him. One officer waited there for the clamshell lock to come. It was sometime during the time when they met with the plaintiff in another building that the lock came and was attached, and then Sergeant Soto went up and stood outside. On the newsroom? Yes. And how does the lock – does it affect Mr. DeSalle's perception of whether he can leave if he wants to? Like, is the lock on the door? It's not on the door of the room he's being talked to? No, no, not at all, Your Honor. They told him that – I believe that they told him they had secured because they said he knew that Sergeant Soto was going back with him to open the door lock. All right. Now – Bounce, I'm saying. What standing – is there anything in between him and the door of the room that they're talking in? Nothing. The door's open. I mean, at the hallway. There's nothing between him and the door. No. Is that the student government office? That's the student government office. That's correct, Your Honor. And I notice that I'm out of time, unless the court had anything. Others in their presence, did the officers who were there, you know, the guards or officers, did they say anything to him? Sergeant Soto didn't say anything. Sergeant Soto was the only one wearing a uniform. He was outside the office. He never came into the office where plaintiff was meeting with Rod Diamond, who was a university official in plainclothes, and Chief Fowler, who was also in plainclothes. And there were three other students there also. Okay. Thank you. Thank you, Your Honor. Thank you, counsel. Mr. Levenbaum, you have some rebuttal time left. I think I have 37 seconds. There were four police officers. The chief was there out of uniform, Sergeant Soto was in uniform, and then there were two bicycle officers directly outside the hallway, outside that door. I think a reasonable person would feel constrained to leave at that point. He had to be let into his newsroom office by Sergeant Soto. When he was let out, he knew he wasn't going to get back in because clamshell lock was reattached to his newsroom office. Whenever he left, he was accompanied by Sergeant Soto both to the office and on his smoke break, and I'm out of time. So thank you, Your Honor. Thank you, counsel. We appreciate the arguments of both parties. The case just argued is submitted.
judges: Aldisert , Graber, Gould